UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TIFFANY CORBIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:23-cv-00718-JPH-MG |
| | ) | |
| INDIANA GAMING COMMISSION, | ) | |
| INDIANA GAMING COMMISSIONERS, | ) | |
| GREG SMALL in his personal and official | ) | |
| capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Tiffany Corbin alleges that the Indiana Gaming Commission and its Executive Director violated Title VII of the Civil Rights Act, the Americans with Disabilities Act, and the Fourteenth Amendment by terminating her employment. Defendants have filed a motion for summary judgment. Dkt. [53]. For the reasons below, that motion is **GRANTED in part** and **DENIED in part**.

**I.
Facts and Background**

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

## A.  Ms. Corbin's employment as a Gaming Enforcement Agent

Ms. Corbin began work as a Gaming Enforcement Agent ("GEA") at the Indiana Gaming Commission ("IGC") in 2006.  Dkt. 55-1 at 40–42.

GEAs are expected to follow the IGC Code of Conduct, which includes a Code of Ethics.  Dkt. 55-20.  That Code of Conduct includes provisions regarding an agent's obligation to not engage in conduct that would "degrade or bring discredit upon the Commission", and duty to "speak or write the truth at all times, whether under oath or not" and to "not make false reports, written, or oral." *Id.* at 2, 4.  In the Code of Ethics, Gaming Enforcement Agents agree to "keep my private life unsullied as an example to all." *Id.* at 1–2.

## B. June 2021 Domestic Violence Incident

In June 2021, Ms. Corbin was in a relationship with Russell Garrison, who was an Indiana State Police ("ISP") lieutenant.  Dkt. 55-1 at 52–53.  Ms. Corbin and Mr. Garrison lived together in a home that they jointly owned. *Id.* at 54.

On the night of June 11, 2021, Mr. Garrison went to a bar while Ms. Corbin remained home.  Dkt. 62-5 at 46.  Once home, Mr. Garrison pushed Ms. Corbin into the stairs and swore at her.  Dkt. 55-1 at 60.  He went to bed "extremely" intoxicated. *Id.*  Ms. Corbin then looked at Mr. Garrison's cell phone account and discovered that he had "been having lengthy conversations with his ex-wife." *Id.* at 61.  This made Ms. Corbin "very upset," and she went to wake Mr. Garrison and confront him. *Id.* at 61.  Mr. Garrison pushed Ms. Corbin a few times before they moved into the kitchen. *Id.* at 61–63.  There,

2

Mr. Garrison "pushed [her] back and pin[ned her] against the kitchen cabinet," *id.* at 65, and "popped" her head off a doorframe, *id.* at 64. Ms. Corbin fell down some of the basement stairs. *Id.* She was bleeding from the head. *Id.* at 66. During the altercation, Ms. Corbin did not strike Mr. Garrison. *Id.* at 67.

Mr. Garrison called the police, *id.* at 67, and Ms. Corbin called her daughter, Sydney, and her parents. *Id.* at 67, 69. Lawrence County sheriff's deputies and state police—including Mr. Garrison's colleagues, subordinates, superiors, and friends—arrived. *Id.* at 74–75, 85, 89. Ms. Corbin was not fully forthcoming with the officers and told her family members to "be vague" when speaking with police. *Id.* at 95–96. Ms. Corbin thought the police were conducting an internal investigation, not a criminal one, and she wanted to protect Mr. Garrison because she worried about him losing his job. *Id.*

Both Mr. Garrison and Ms. Corbin were charged with domestic battery. *Id.* at 96–97. As part of an informal diversion agreement, Ms. Corbin attended therapy sessions, *id.* at 118–119, and the charge was dismissed, dkt. 55-10. Ms. Corbin continues to attend therapy and has been diagnosed with depression, anxiety, and PTSD. Dkt. 55-1 at 167, 177. She has been taking various medications to treat those conditions. *See id.* at 167, 176–77.

**C. IGC Investigation**

The IGC placed Ms. Corbin on desk duty when it learned of the June 11 altercation. *Id.* at 100. After the charges were dismissed, Greg Small, the executive director of the Commission, authorized an internal investigation into Ms. Corbin's actions. Dkt. 55-2 at 12–13. IGC Charity Gaming Assistant

3

Director Mark Mason and Human Resources Director Shadi Lilly conducted the investigation. Dkt. 55-11. Prior to this investigation, Ms. Corbin had never been disciplined and had received only positive evaluations and letters of commendation over her more than fifteen-year career with IGC. Dkt. 55-22 at 5.

During her interview with Mr. Mason and Ms. Lilly, Ms. Corbin admitted that she was not forthcoming when she was interviewed by the police during the early morning hours of June 12. Dkt. 55-1 at 128–138; dkt. 55-13. She also admitted that she had violated the "keep my private life unsullied" provision of the Code of Ethics, and the provisions of the Code of Conduct addressing discredit on the Commission and unlawful acts. *Id.* Ms. Corbin discussed being a victim of domestic violence and being in therapy. Dkt. 55-13.

After the investigation, Dan Hirst (deputy superintendent of the law enforcement division), Rob Townsend (the superintendent in law enforcement), and Tom McCord (assistant director of law enforcement) recommended to Mr. Small that Ms. Corbin be suspended without pay for 85 hours and transferred to work at a different casino as discipline. Dkt. 55-15. They did "not believe termination should be considered" at that time. *Id.* Jennifer Reske (IGC deputy director) separately recommended to Mr. Small that Ms. Corbin be terminated. Dkt. 55-4 at 46.

As executive director, Mr. Small was the ultimate decision-maker as to discipline. Dkt. 55-2 at 19. He concluded that Ms. Corbin had violated the

Code of Conduct and Code of Ethics, based on her involvement in the domestic violence incident and her admission that she had not been forthcoming with law enforcement on the night of the incident. *Id.* He decided to terminate Ms. Corbin's employment. *Id.*

Mr. Small was also the ultimate decision-maker with respect to GEA John Groover, who was disciplined but not terminated after being charged with domestic battery, and Gaming Enforcement Officer Carl Diaz, who was disciplined but not terminated after being investigated for potentially lying on a probable cause affidavit. *Id.* at 43–44, 52–54.

### D. Procedural history

Ms. Corbin brought this action against the Indiana Gaming Commission, the Indiana Gaming Commissioners, and Greg Small, alleging gender and disability discrimination. Dkt. 1. Defendants moved for summary judgment. Dkt. 53.

## II.
## Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this

burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

### III.
### Analysis

#### A. Title VII sex discrimination

Title VII makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. 2000e-2(a)(1). "[T]he singular question that matters in a discrimination case" is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself …. Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*

In an employment discrimination case, a plaintiff may organize and present evidence using the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Johnson*, 892 F.3d at

895.  It's important to bear in mind, however, that "there is no magic to this test; it is merely one way of culling the relevant evidence needed to demonstrate whether a reasonable factfinder could conclude that an employer engaged in an adverse employment action based on the plaintiff's race or other proscribed factor."  *Id.* at 894.

To establish a prima facie case under *McDonnell Douglas*, a plaintiff must show that she (1) belonged to a protected class, (2) met her employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was similarly situated to other employees who were not members of the protected class and who were treated better.  *McDonnell Douglas*, 411 U.S. at 802.  If the plaintiff makes a prima facie case, the burden shifts to the defendant to give a legitimate, non-discriminatory reason for the adverse employment action.  *Id.* If the defendant meets this burden, the burden shifts back to the plaintiff to show that the defendant's explanation was a pretext.  *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017).

Here, it's undisputed that Ms. Corbin, as a female, is a member of a protected class, and that her termination constitutes an adverse employment action.  Dkt. 58 at 14; dkt. 66 at 25.  Defendants argue that Ms. Corbin cannot establish the remaining elements needed to show a prima facie case of sex discrimination under the *McDonnell Douglas* framework.  They contend that first, she was not meeting the IGC's legitimate expectations at the time of her termination, and second, she has not identified any similarly situated employees who were not members of the protected class and who were treated

7

better, that is, "comparators." Dkt. 58 at 14–15. In the context of a "disparate punishment" claim such as Ms. Corbin's, a plaintiff may establish these two elements by "showing that a similarly situated employee outside the plaintiff's class committed a similar act but was subject to less severe discipline." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013).[1]

### 1. Prima facie case

To establish a prima facie case, Ms. Corbin must identify comparators, that is, other employees who engaged in similar or worse conduct but were "subject to less severe discipline" for that conduct. *Perez*, 731 F.3d at 704; *Dunlevy v. Langfelder*, 52 F.4th 349, 354 (7th Cir. 2022) ("If a comparator engaged in equivalent or more egregious conduct than the plaintiff but received a lighter punishment, or none at all, that satisfies the inquiry."). "A suitable comparator is an employee who is directly comparable to the plaintiff 'in all *material* respects.'" *Palmer v. Ind. Univ.*, 31 F.4th 583, 590 (7th Cir. 2022) (quoting *Warren v. Solo Cup Co.*, 516 F.3d 627, 630–31 (7th Cir. 2008)) (emphasis in original). "There must be 'enough common factors' between the plaintiff and his comparator 'to allow for a meaningful comparison.'" *Palmer*, 31 F.4th at 590. "[W]hether employees are similarly situated is a 'flexible, common-sense, and factual' inquiry." *David*, 846 F.3d at 225. Factors that can guide the inquiry include "whether the employees (i) held the same job

---

[1] Defendants argue in their reply that Ms. Corbin, by focusing on presenting comparators and illustrating pretext, has "waived" any argument about the legitimate expectations aspect of her claim. There is no waiver because here those prongs merge. *Elkhatib v. Dunkin Donuts, Inc.* 493 F.3d 827, 830 (7th Cir. 2007).

description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications." *Crain v. McDonough*, 63 F.4th 585, 592 (7th Cir. 2023) (quoting *David*, 846 at 226).

Here, Ms. Corbin identifies John Groover and Carl Diaz as comparators. Dkt. 66 at 20-21. Mr. Groover worked as a gaming enforcement agent, the same position as Ms. Corbin, and was the subject of two IGC internal investigations. Dkt. 62-15 at 22–23. The first investigation was in 2017 in response to Mr. Groover having used threatening language toward a supervisor. *Id.* The second investigation was in response to Mr. Groover being charged with domestic battery after his wife called 911 and reported a domestic violence incident between her and Mr. Groover the previous day. Dkt. 62-16 at 104. She had a swollen and bruised eye, though Mr. Groover denied having hit her, except possibly by accident in self-defense. *Id.* Mr. Groover was charged with domestic battery, though the charge was later dismissed as part of a diversion program. Dkt. 62-15 at 24.

IGC then conducted an internal investigation. Dkt. 62-16 at 103. Mr. Groover denied striking his wife unless by accident and suggested she may have instead gotten the black eye when their truck got stuck in a muddy field. *Id.* at 104. The investigation report also noted that "[t]here seems to be some type of informal agreement or understanding between [Mr. Groover] and [his wife] not to report issues to the police due to the ramifications of a battery charge against a police officer." *Id.* Mr. Groover was found to have violated the

9

Code of Conduct, the Code of Ethics, and Rules of Conduct, including the section about bringing discredit on the commission and living an unsullied life—the same that Ms. Corbin was found to have violated—and two other provisions. Dkt. 62-15 at 24. He was suspended for 170 hours and transferred to a different casino. Dkt. 62-15 at 24. Greg Small was the supervisor responsible for disciplinary decisions at that time. Dkt. 52-2 at 43–44.

The second comparator, Mr. Diaz, worked as a gaming enforcement officer. Dkt. 66 at 21. Mr. Diaz had been disciplined on five previous occasions. Dkt. 52-16 at 26. One of those investigations involved allegations that Mr. Diaz had submitted an inaccurate probable cause affidavit to a prosecutor in connection with an arrest. Dkt. 62-15 at 27. Mr. Diaz's version of events was inconsistent with how two other officers who were involved reported the arrest. *Id.* at 28. During the internal investigation, Mr. Diaz stuck by his version, and the investigation ultimately "could not prove that Mr. Diaz was lying, only that he was incorrect" and "misdiagnosed the facts . . . [in] stark contrast to his partners" to the extent that it "made [IGC leadership] lose faith with him as a gaming control officer." Dkt. 55-2 at 53. He was found to have violated several sections of IGC policies, including the section on Commission goals and policy, and was suspended for 85 hours and reassigned to a gaming enforcement agent position. Dkt. 62-15 at 28. Greg Small was the supervisor responsible for disciplinary decisions at that time. Dkt. 52-2 at 52–53.

10

Defendants argue that Ms. Corbin cannot use Mr. Groover and Mr. Diaz as comparators because they did not have the same direct supervisor, Mr. Diaz was an officer rather than an agent, and the misconduct at issue for each was factually different. Dkt. 58 at 16; dkt. 74 at 8–10. Defendants also argue that Mr. Groover and Mr. Diaz cannot be used as comparators because the IGC did not conclude that either had lied while Ms. Corbin admitted that she had not been forthcoming with the police when she was interviewed.[2] *Id.*; dkt. 66 at 21–23.

A comparator "need not be identical in every conceivable way." *Johnson*, 892 F.3d at 895; *Dunlevy*, 52 F.4th at 354 ("[C]ourts should not draw the question of similarly situated too narrowly."). While that's the case here, there are sufficient similarities for Mr. Groover and Mr. Diaz to be used as comparators. First, while Ms. Corbin, Mr. Groover, and Mr. Diaz did not share the same direct supervisor, Greg Small was the ultimate decision-maker regarding the discipline imposed with respect to all three. *See Coleman v. Donahue*, 667 F.3d 835, 848 (7th Cir. 2012) (noting that having the same decision-maker, not necessarily the same direct supervisor, is the key factor in the similarly-situated inquiry). Second, they held similar positions—Mr.

---

[2] Defendants also object to Plaintiff's use of statements attributed to Mr. Groover's wife as inadmissible hearsay. Dkt. 74 at 9. Defendants make the same argument regarding other "nonparty statements" included in law enforcement reports relating to the disciplinary proceedings of other agents. *Id.* at 2–3. To the extent that the Court has considered any of these statements in its analysis, they are used only for the non-hearsay purpose of determining what IGC leadership was aware of when making disciplinary decisions, not to prove the truth of the underlying allegations against any other employee. Fed. R. Evid. 801(c) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement.").

Groover had the same job as Ms. Corbin and Mr. Diaz was a gaming enforcement officer.   While Mr. Diaz was an officer rather than an agent, "difference in job title alone is not dispositive" of whether a comparator is similarly situated.  *Id.* at 848.  The key question instead is whether the employees were subjected to the same policies.  *Id.*  Defendants briefly argue that "there is no evidence that a [gaming enforcement officer] was held to the same standards as a gaming enforcement agent," dkt. 58 at 16, but the designated evidence shows that gaming enforcement officers are subject to the same chain of command, disciplinary process, and code of conduct as gaming enforcement agents.  Dkt. 55-3 at 50–51.  From this evidence, a jury could find that officers and agents were subject to the same policies.

The last inquiry is whether the misconduct among the comparators was comparable.  Both parties cite to *Dunlevy v. Langfelder* on this point.[3]  52 F.4th at 351.  There, Mr. Dunlevy, a white man, was fired from his position as a utility water meter reader for inaccurately recording water meters and sued the city for racial discrimination.  *Id.* at 352.  He identified Mr. Murray—a black meter reader—as a comparator.  *Id.* at 351, 353–54.  Both Mr. Dunlevy and Mr. Murray had the same supervisory structure and received the same pay.  *Id.* at 352.  Mr. Murray would start work late, leave work early, and at times "walk off the job while on duty."  *Id.*  Mr. Dunlevy and Mr. Murray's supervisors

---

[3] Defendants cite to *Dunlevy* as "instructive" and draw parallels between Ms. Corbin's situation and the situation presented in that case, noting that "the court concluded" that Mr. Dunlevy's conduct was meaningfully worse than that of the comparator, and therefore the comparator was not similarly situated.  However, Defendants cite to the *Dunlevy* dissent, not the majority opinion.

recommended that both men be fired—Mr. Dunlevy for the inaccurate meter recording, and Mr. Murray for tardiness and absenteeism—but only Mr. Dunlevy was terminated. *Id.* The district court determined that Mr. Dunlevy and Mr. Murray were not similarly situated and granted summary judgment for the employer. *Id.* The Seventh Circuit reversed, determining that Mr. Murray was an appropriate comparator. *Id.* at 354.

In reaching its conclusion, the Court found that Mr. Dunlevy's misconduct was comparably serious to Mr. Murray's misconduct. "Dunlevy's meter curbing undermined the core function of the utility, and Murray's tardiness and absences undermined a basic tenet of any employment: be present." *Id.* at 355. The Court noted that "[w]e have repeatedly warned that courts should not draw the question of similarly situated too narrowly" and that "[t]he north star in the similarly situated inquiry has always been whether the two employees 'engaged in conduct of comparable seriousness.'" *Id.* at 354. As a reasonable factfinder could conclude that Mr. Dunlevy's and Mr. Murray's conduct was comparably serious and undermined the employer's "core mission," summary judgment was improper. *Id.* at 351–52, 354.

Here, Ms. Corbin, Mr. Groover, and Mr. Diaz were all found to have violated provisions of the Code of Conduct and Code of Ethics about keeping one's private life unsullied and not bringing discredit on the Commission, among others. Defendants argue that no determination was made that Mr. Groover and Mr. Diaz lied while Ms. Corbin admitted to not being forthright. *See* dkt. 74 at 8–11. This requires too much of the comparator test—precise

13

overlap is not necessary in analyzing whether a comparator's conduct is "comparably serious."  A reasonable factfinder could conclude from the designated evidence that the misconduct allegations and findings against Mr. Groover and Mr. Diaz, are "comparably serious" conduct to Ms. Corbin's. *Dunlevy*, 52 F.4th at 354, 355 n.1; *Ezell v. Potter*, 400 F.3d 1041, 1049 (7th Cir. 2005).

In sum, Ms. Corbin has designated evidence from which a jury could find that Mr. Groover's and Mr. Diaz's misconduct was "comparably serious" to Ms. Corbin's misconduct, so Ms. Corbin has established the comparator element of her prima facie case.  *See Johnson*, 892 F.3d at 895 (noting that unless the plaintiff has "no evidence" to meet her burden under the summary judgment standard, "[w]hether a comparator is similarly situated is typically a question for the fact finder"); *Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 958 (7th Cir. 2021).  And because a plaintiff need only provide one comparator to make out her prima facie case, *see Dunlevy*, 52 F.4th at 354, the Court does not address whether any other potential comparators are similarly situated.

### 2. Reason for termination and evidence of pretext

Once a plaintiff makes out the prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action.  *McDonnell Douglas*, 411 U.S. at 802.  If the employer does so, then the burden shifts back to the plaintiff to show that the reason is pretextual.  *David*, 846 F.3d at 225.  In the pretext inquiry, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but

whether the employer honestly believed the reasons it has offered to explain the discharge." *Id.*

Here, IGC asserts that its legitimate, non-discriminatory reason for terminating Ms. Corbin's employment was that Ms. Corbin was involved in a domestic altercation and was not forthcoming during an interview with the law enforcement officers. Dkt. 58 at 19. Ms. Corbin argues that because Mr. Groover and Mr. Diaz engaged in comparably serious misconduct yet were not fired, a jury could conclude that IGC's stated reason for her termination was pretext. Dkt. 66 at 39.

As explained above, from the designated evidence a jury could conclude that Mr. Groover and Mr. Diaz engaged in misconduct comparable to Ms. Corbin but received less severe sanctions. Comparator evidence "can do 'double-duty' at both the *prima facie* and pretext stages and is "'especially relevant' at the pretext stage." *Coleman*, 667 F.3d at 841–42, 858 (quoting *McDonnell Douglas*, 411 U.S. at 804). An employer "selectively enforc[ing] a company policy against one gender but not the other" can show pretext, and "[a] discrimination plaintiff may employ such comparator evidence to discharge her burden at the pretext stage." *Id.* at 853, 858.

Here, a reasonable jury could conclude from the comparators that IGC treated Ms. Corbin more harshly than it treated male employees who committed comparable violations, that the stated reason for Ms. Corbin's termination was pretextual, and that her sex was the reason that Mr. Small terminated her employment. *See Coleman,* 667 F.3d at 854; *Rudin v. Lincoln*

15

*Land Comm. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005) ("[O]nce the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury—not the court.").  And because there is sufficient evidence to create a triable issue of fact on pretext, the Court does not reach the parties' other arguments.

Summary judgment is therefore **DENIED** as to the Title VII claim.

### B. Section 1983 Equal Protection

Ms. Corbin brings a § 1983 claim against Mr. Small in his personal capacity for violating her Fourteenth Amendment right to equal protection, based on Mr. Small's personal involvement in her termination.  Dkt. 1 at 8–9.  "When a plaintiff uses § 1983 as a parallel remedy to a Title VII harassment claim, the *prima facie* elements to establish liability are the same under both statutes."  *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 835 (7th Cir. 2015); *see Salas v. Wisconsin Dep't of Corrections*, 493 F.3d 913, 926 (7th Cir. 2007).  Here, Defendants argue that they are entitled to summary judgment for the same reasons already presented regarding the Title VII claim.  Dkt. 58 at 19.  In response, Ms. Corbin asserts that it is undisputed that Mr. Small was personally involved in the deprivation of her constitutional rights, as is necessary to establish personal liability under § 1983.  Dkt. 66 at 8.[4]

---

[4] In their reply, Defendants argue that Ms. Corbin has "waived any argument" with respect to this claim, for not citing enough cases or standards for Equal Protection claims.  However, as Defendants noted in their own brief, the analysis for Ms. Corbin's § 1983 Equal Protection claim is the same as for Ms. Corbin's Title VII sex discrimination claim.

As the analysis for both claims is the same and Ms. Corbin has met her burden to survive summary judgment on her Title VII claim, summary judgment is **DENIED** with respect to the § 1983 claim.

## C. Americans with Disabilities Act

Ms. Corbin's claims under the Americans with Disabilities Act seek prospective injunctive relief against Mr. Small and the Indiana Gaming Commissioners in their official capacities. Dkt. 1; dkt. 66 at 33 n.4; *see Ex parte Young*, 209 U.S. 123 (1908) (allowing injunctive suits to proceed against officials in their official capacity). Ms. Corbin alleges that the IGC failed to accommodate her and that she was terminated because of her disabilities. Dkt. 1 at 9–10.

### 1. Discrimination claim

The ADA prohibits employers from discriminating because of an employee's disability. *See A.H. v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592 (7th Cir. 2018) (citing 29 U.S.C. § 794(a); 42 U.S.C. § 12132). To succeed on her ADA claim, Ms. Corbin must show that (1) she was disabled, (2) she "was qualified to perform essential functions [of her job] with or without reasonable accommodation," and (3) her disability was the cause of her termination. *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). The Defendants argue that they are entitled to summary judgment because Ms. Corbin was not disabled, was not qualified to perform the essential functions of her job, and

was not terminated because of a disability.[5]  Dkt. 58 at 21.  Ms. Corbin

responds that her depression, anxiety, and PTSD constitute disabilities

protected under the ADA, and that she was terminated because of those

disabilities.  Dkt. 66 at 36.  Because the third element, causation, is dispositive

here, the Court addresses only that element and does not reach the others.

To meet the causation requirement, a plaintiff must show that a

reasonable jury could conclude from the designated evidence that she "would

not have suffered the same adverse employment action if [she] were not

disabled and everything else had remained the same." *Kurtzhals v. County of

Dunn*, 969 F.3d 725, 729 (7th Cir. 2020).  Defendants argue that this is a "but-

for" causation standard, dkt. 58 at 28, though "it remains an open question in

this circuit" whether that remains the proper standard after the ADA

Amendments Act changed the ADA's statutory language from prohibiting

discrimination "because of" a disability to "on the basis of" a disability.  *Id.* at

728; *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504 (7th Cir. 2017); *Schoper

v. Bd. of Trs. of W. Illinois Univ*, 119 F.4th 527, 534 n.1 (7th Cir. 2024).  Ms.

---

[5] Defendants also moved to exclude the expert report of mental health counselor
Jenelle Linden as inadmissible hearsay, as it was initially submitted unsworn.  Dkt.
74.  Ms. Corbin then submitted an identical copy, now accompanied by a sworn
declaration.  Dkt. 77.  The Court has discretion to allow parties to fix certain
problems—such as the lack of a declaration accompanying the expert report, as seen
here—by supplementing the initial, deficient evidence.  *See Cehovic-Dixneuf v. Wong*,
895 F.3d 927, 931–32 (7th Cir. 2018); *Bewley v. Turpin*, 2022 WL 2317426, at *5–6
(S.D. Ind. June 27, 2022) (collecting cases).  Here, Defendants do not argue that they
were prejudiced by the deficient report or that its contents are inadmissible on other
grounds.  *See* dkt. 77 at 1 ¶ 5; dkt. 78 at 3 ¶ 7.  Consequently, it is in the interest of
justice to permit Ms. Corbin to amend the expert report with Ms. Linden's declaration,
and her motion for leave to file supplement designation of evidence, dkt. 77, is
**GRANTED.**

Corbin does not argue for a different standard, so the Court applies the but-for standard here.

Defendants contend that Ms. Corbin cannot show causation because neither Ms. Reske nor Mr. Small, the decisionmaker, were aware that Ms. Corbin had anxiety, depression, or PTSD. Dkt. 58 at 28. Ms. Corbin argues that IGC had sufficient knowledge of her anxiety, depression, and mental health treatment to be aware she was disabled. Dkt. 66 at 34–35.

Executive director Mr. Small and deputy director Ms. Reske both testified that they were not aware that Ms. Corbin had PTSD, anxiety, or depression. Dkt. 55-2 at 40–41; dkt. 55-4 at 120–21. Ms. Corbin has not designated evidence that casts doubt on that testimony or from which a jury could otherwise find that Mr. Small and/or Ms. Reske knew that Ms. Corbin had those conditions. Ms. Corbin contends, however, that Mr. Small was nonetheless aware that Ms. Corbin was a victim of domestic abuse and in counseling. *See* dkt. 55-2 at 41; dkt. 62-9. Even if Mr. Small could have inferred that Ms. Corbin was suffering from a mental health disability based on knowledge that she was a domestic abuse victim and was in counseling, Ms. Corbin has not designated evidence from which a jury could find that a mental health disability was the but-for cause of Ms. Corbin's termination. *See Monroe*, 871 F.3d at 504 (discussions about whether employee genuinely suffered from PTSD insufficient to show intent to discriminate against him on that basis); *Kurtzhals*, 969 F.3d at 730 (employer's potential awareness of employee's PTSD diagnosis insufficient to show PTSD was but-for cause of

19

discipline).  Given the lack of designated evidence, no reasonable jury could infer that Mr. Small terminated Ms. Corbin because of her anxiety, depression, and PTSD.  Consequently, Defendants are entitled to summary judgment on the disability discrimination claim.

### 2. Failure to accommodate

The Americans with Disabilities Act requires covered employers to reasonably accommodate the "known physical or mental limitations of an otherwise qualified individual with a disability who is an [] employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business."  42 U.S.C. § 12112 (b)(5)(A).  To establish a claim for failure to accommodate, a plaintiff must show: (1) she is a qualified individual with a disability; (2) the employer was aware of her disability; and (3) the employer failed to reasonably accommodate the disability.  *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013).  Defendants argue that Ms. Corbin never requested a reasonable accommodation as she was obligated to have.  Dkt. 58 at 29–30; *see Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 989 (7th Cir. 2000).  Ms. Corbin responds that it was IGC's duty to initiate the interactive process to determine a reasonable accommodation.  Dkt. 66 at 36.

"The standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."  *Jovanovic*, 201 F.3d at 989.  "Where the employee does not provide sufficient information to the employer to determine the necessary accommodations, the employer cannot be

held liable for failing to accommodate the disabled employee." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 702 (7th Cir. 2014). An employer must participate in the interactive accommodations process in good faith, and "if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996).

Here, it is undisputed that Ms. Corbin did not request an accommodation. She therefore must designate evidence from which a jury could find that IGC knew that Ms. Corbin may have needed an accommodation but was unable to ask for it. While the designated evidence shows that superintendent Mr. Townsend and deputy superintendent Mr. Hirst were aware that Ms. Corbin had depression and anxiety, *see* dkt. 55-1 at 119–20, 176; dkt. 62-9, there is no designated evidence that they—or anyone else at IGC— thought that those diagnoses were disabilities that required any accommodations. *See Reeves*, 759 F.3d at 702. And there is no designated evidence that Ms. Corbin was unable to communicate such a need.

Ms. Corbin relies on *Bultemeyer* to argue that IGC should have nonetheless initiated the interactive accommodations process. There, Mr. Bultemeyer—who suffered from serious mental illnesses—was informed upon his return from disability leave that he would have to take a job without any of the special accommodations he had received at his old position; he expressed to the employer that he could not work in that position but did not want to resign. 100 F.3d at 1282. He then provided a doctor's note requesting a "less

stressful" position. *Id.* In response, the employer fired him. *Id.* The Seventh Circuit determined that the employer had not engaged in the interactive process in good faith. Although Mr. Bultemeyer did not specifically request an accommodation, the employer was obligated to work with him to determine necessary accommodations as it was clear that Mr. Bultemeyer did require an accommodation but was unable to effectively communicate that need due to his severe mental illness. *Id.* at 1285–86. Here, in contrast, Ms. Corbin never indicated that she needed any accommodations, nor was there any indication that she could not have asked for an accommodation if she did require one.

Because no reasonable jury could find that IGC was aware of Ms. Corbin's need for accommodation, IGC had no obligation to engage in the interactive accommodation process. Therefore, summary judgment is **GRANTED** on the failure-to-accommodate claim, and the Court does not reach the parties' arguments regarding the other elements.

## IV.
## Daubert motion

Defendants filed a Daubert motion to exclude the expert testimony of Jenelle Linden. Dkt. 82. "Federal Rule of Evidence 702 governs the admissibility of expert testimony." *Anderson v. Raymond Corp.*, 61 F.4th 505, 508 (7th Cir. 2023). To determine whether Rule 702 is satisfied, courts apply the "familiar *Daubert* two-step framework." *Robinson v. Davol Inc.*, 913 F.3d 690, 695 (7th Cir. 2019) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)). Under this framework, the Court first evaluates the expert's qualifications and the reliability of her opinions. *See id.* At step two,

22

the Court must assess whether "the expert testimony will assist the trier of fact." *Robinson*, 913 F.3d at 695.

Here, much of the parties' arguments focus on whether Ms. Linden's testimony would help the jury understand evidence relating to whether Ms. Corbin is disabled. Dkts. 82, 83, 84. In light of this Order granting the defendants summary judgment on the ADA claims, those claims will not proceed to trial. Because of that, the Daubert motion is **DENIED without prejudice**. To the extent that Defendants wish to raise a Daubert challenge to Ms. Linden's testimony as relevant to the Title VI and § 1983 claims, they must refile such a motion by **September 30, 2025.**

## V.
## Conclusion

For the above reasons, Defendants' motion for summary judgment is **DENIED** as to Ms. Corbin's Title VII and § 1983 claims and **GRANTED** as to her ADA claims. Dkt. [53].

Plaintiff's motion for leave to file supplement designation of evidence is **GRANTED**. Dkt. [77].

Defendants' motion to exclude the testimony of Jenelle Linden is **DENIED without prejudice** to refile by **September 30, 2025**. Dkt. [82].

Magistrate Judge Garcia is asked to hold a status conference to discuss settlement and trial readiness.

**SO ORDERED.**

Date: 7/24/2025

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel